NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0400n.06

No. 12-2256

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Apr 22, 2013*
DEBORAH S. HUNT, Clerk

JANINE SOUTHER,                    )
                                        )
     Plaintiff-Appellant,         )
                                          )
           v.                       )
                                          )
POSEN CONSTRUCTION, INC.; RICK MINARD,   )
                                          )
     Defendants-Appellees.       )
                                          )

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE: SILER, GIBBONS, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Janine Souther appeals the adverse grant of summary judgment on her claims against her former employer for sexual harassment and intentional infliction of emotional distress. We affirm.

I.

Janine Souther met defendant Rick Minard sometime during 1977. Minard started dating Souther's cousin, and Souther would often "tag along" on dates. Souther was later a bridesmaid at Minard's wedding in 1982. When he gave his deposition in this matter, Minard was still married to Souther's cousin.

Sometime in 2005, at Souther's request, Minard suggested that Souther apply for a job at non-party John Carlo Construction Company in Detroit, where Minard was then employed as General Superintendent of the company's earth moving division. (He also helped her get a job there

in 1997 or 1998.) John Carlo hired her as an on-the-job trainee learning to operate heavy equipment, and he became her supervisor. Two weeks later, Souther and Minard began an affair that would last, more or less continually, until October 2010.

Construction work often is seasonal in Michigan. When the temperature drops, the construction industry slows and workers are laid off. That was the case with Souther at John Carlo. Each year she was laid off during the "winter months" and rehired in the spring. Minard and Souther continued their affair during these layoff periods. Following Souther's layoff in 2008, John Carlo Construction closed its public works division permanently, which ended Minard's employment with the company, along with Souther's prospects for being rehired in the spring. The two remained friends and kept in touch, on occasion having lunch together. (Souther thinks the sex may have stopped at this point, but is not entirely sure; Minard says it continued.) As in the past, Minard continued to provide Souther with money when she needed it. He also helped with repairs and upgrades to her home, including laying tile, re-plumbing the bathroom, replacing frozen pipes, and installing a ceramic-tiled shower.

Following his employment with John Carlo Construction, Minard retired from the laborers' union and started his own company—Strategic Planning Solutions, LLC—with Minard as its sole employee. Shortly after forming the company, defendant Posen Construction, Inc., hired it to oversee some of Posen's day-to-day operations. Three or so months later, in March 2009, Minard offered Souther a job with Posen. She was again hired as an on-the-job-trainee learning to operate

heavy equipment. Minard was again her supervisor. A week after she started work, the two started having sex again, approximately once a week.

Souther's first assignment with Posen involved coordinating trucks in Toledo, Ohio. Minard was in charge. Souther and Minard lived in Toledo together during the job. The project ended after a month or so, according to Souther, because Minard was transferred to a project elsewhere. That was fine with Souther because she "wanted to go back home" anyway, and so never asked to continue working in Toledo. The sex abated, as did (possibly—Souther is not sure) any communication between the two. Roughly a year later, in March 2010, Minard offered Souther another job with Posen, and she accepted. Two weeks later, Minard and Souther began having sex again.

The two last had sexual relations on Labor Day in 2010 (September 6). That was also Souther's last week of work at Posen. According to Souther, Minard had been treating her differently during August, and when she asked why, he assured her everything would be fine. She took that to mean that she would keep her job. Two days following their last sexual encounter, Posen laid Souther off, effective that day. Although she personally believed it was because Minard wanted to end the relationship, he in fact told her it was because work on her project had slowed. Souther called Minard in early October to ask for work, but none was available. Minard called Souther in mid-October 2010 and finally ended the affair.

In November, Souther went to Posen's head office, disclosed the affair, and asked to be added to the list of individuals to be called for work when the construction season restarted. Her name was added to the list.

Souther filed a charge with the Equal Employment Opportunity Commission and obtained a right-to-sue-letter. She then filed this lawsuit, alleging a bevy of claims against Posen and Minard for violations of state and federal anti-discrimination laws and state tort law. After discovery, defendants filed a motion for summary judgment, which the district court granted. Souther appealed.

## II.

We review de novo a district court's grant of summary judgment. *King v. Taylor*, 694 F.3d 650, 661 (6th Cir. 2012). Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## III.

Souther has briefed only her claims for *quid pro quo* sexual harassment and intentional infliction of emotional distress. All others are therefore abandoned, and we do not address them. *See Music v. Arrowood Indem. Co.*, 632 F.3d 284, 286 n.1 (6th Cir. 2011).

A.

Title VII of the Civil Rights Act prohibits discrimination in the workplace on the basis of sex. *See* 42 U.S.C. § 2000e-2(a)(1). "Sexual harassment" is one form of discrimination. *See* 29 C.F.R. § 1604.11. What is commonly known as *quid pro quo* sexual harassment, to be contrasted with so-called hostile-work-environment sexual harassment, *see generally Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751–54 (1998), "is anchored in an employer's sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments," *Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 648 (6th Cir. 1986). To succeed, a plaintiff must prove, as relevant here, that he or she "was subjected to unwelcome[] sexual harassment in the form of sexual advances or requests for sexual favors" and that submitting to these demands or advances was an express or implied condition for receiving job benefits, or that refusing to submit resulted in a tangible job detriment. *Id.* A plaintiff must make essentially the same showing to succeed on an analogous claim under Michigan law. *See* Mich. Comp. Laws § 37.2103(i)(*i*)–(*ii*).

To determine whether a co-worker's sexual advances or requests are unwelcome, we focus on the plaintiff's "words, deeds, and deportment." *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1011 (7th Cir. 1994) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 69 (1986)). On this record, a jury could not find Minard's advances unwelcome. First of all, Souther never complained to Minard, human resources, her union representative, or anyone else, that Minard's advances were unwelcome. *See, e.g.*, *Wisniewski v. Pontiac Sch. Dist.*, 862 F. Supp. 2d

586, 597 (E.D. Mich. 2012) (sexual advances not unwelcome in part because plaintiff never told her supervisor that a continued sexual relationship was not wanted); *Moberly v. Midcontinent Commc'n*, 711 F. Supp. 2d 1028, 1038 (D.S.D. 2010) (jury could reasonably find advances unwelcome where plaintiff communicated to her supervisor that his sexual comments were unwelcome). Souther's after-the-fact statement in her deposition that she felt coerced into starting the sexual relationship is a "scintilla of evidence in support of [her] position," and is not enough for a jury to find in her favor. *Anderson*, 477 U.S. at 252.

Souther's conduct during the relationship also demonstrates that the extramarital affair was not unwelcome. The record shows that Souther was a willing participant, even though Minard was the one who put things into motion. The two had known each other and were friends for close to thirty years when the affair began. They remained friendly during times when the affair was dormant. They took trips together. One involved an overnight camping trip. Another involved Souther visiting Minard in Lansing, where he was working a job for Posen; Souther did not work for Posen at the time. The couple resided together in a hotel while they both worked for Posen in Toledo. The one time Souther threatened to disclose the affair to Minard's wife was *after* Minard ended it, when Souther became angry about being unemployed. Minard freely gave Souther money when she asked, and never sought repayment. He offered to make repairs and upgrades to her home, and she freely accepted. Further, Souther trusted Minard with her private information, including her banking information. He once deposited into her bank account money she later used to pay bills. She also gave him the password to her email account so he could use it to send her resume on her

behalf. Finally, during the entire course of the affair, Souther was sexually intimate with Minard and no one else. Given the nature of the close and consensual relationship, no jury could find Minard's advances unwelcome.

In addition, Souther lacks evidence from which a jury could find the existence of another element of her claims—that submitting to Minard's advances "was an express or implied condition for receiving job benefits" or that refusing resulted in a tangible job detriment. *Highlander*, 805 F.2d at 648; Mich. Comp. Laws § 37.2103(i)(*i*). Although Souther personally felt she would lose her job at John Carlo if she refused sex with Minard, she has not explained *why* she felt that way. More relevant here, she concedes that Minard never conditioned his offer of employment with defendant Posen upon her having sex with him. And at no time during the sexual encounter immediately following Souther's first day with Posen, a week after she was hired, did Minard ever say or do anything implying that her job would be in jeopardy should she rebuff him. The same is true of when Posen rehired her in 2010: Minard mentioned nothing about sex. (Minard once joked that he would fire Souther if she did not have sex with him, but Souther admits that she took it as a joke.) Finally, it was *Minard* who ended the affair, and he did so almost a month *after* Souther was laid off from Posen, so she cannot show that refusing his advances (which she never did) caused her layoff.

Souther's state and federal claims for *quid pro quo* sexual harassment lack merit, and therefore the district court's grant of summary judgment on these claims was appropriate.

B.

Next, Souther challenges the grant of summary judgment on her claim for intentional infliction of emotional distress. To succeed, she must offer evidence from which a jury could reasonably conclude that defendants, with intent or recklessness, engaged in extreme and outrageous conduct that caused her to suffer severe emotional distress. *Dalley v. Dykema Gossett, PLLC*, 788 N.W.2d 679, 694 (Mich. Ct. App. 2010). Defendants' conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (internal quotation marks omitted).

It is difficult to pin down what conduct Souther claims satisfies this high standard. The allegations in the complaint appear to piggyback on Souther's discrimination claims, but it is unclear which ones she raised on summary judgment. We will focus on the conduct discussed in her appellate brief. Souther first says it was outrageous for Minard to condition her continued employment with Posen upon having sex with him and then terminate her when he lost interest. But she lacks evidence to support this theory. As indicated above, other than their rough proximity in time, the affair and Souther's employment had nothing to do with each other.

Next, Souther claims Posen is liable for not investigating Minard's alleged harassment until months after Souther reported it to management. But she has not explained what about delaying the investigation was extreme and outrageous. Nor is there anything outlandish about the way Posen investigated the allegations. She says the company intentionally rounded up all male employees that

had negative things to say about her and had them make statements so as to create a record of poor work history. But she lacks evidence in support, even assuming the conduct is tortious.

Souther also claims Minard threatened her when she said she would expose the affair to Minard's wife. (Minard suggested Souther "sleep with one eye open" if she told.) However else one might characterize such conduct—petty, childish, maybe criminal—no jury could find it extreme and outrageous in the context in which it occurred. She claims further that Minard entered her home without her permission. But this, too, is not cognizable conduct, whatever else it is. Finally, she claims Minard intentionally delayed submitting her unemployment paperwork after Posen laid her off for the last time. But when the paperwork was finally submitted, it was retroactive to the time of layoff, so Souther received all of her benefits. Regardless, the conduct is not outrageous. *Cf. Brown v. Cassens Transport Co.*, 546 F.3d 347, 364 (6th Cir. 2008) (defendant's alleged fraudulent denial of plaintiffs' workers compensation benefits not outrageous). In short, none of the conduct alleged here approaches the level of outrageousness Michigan courts have deemed sufficient to submit to a jury. *See, e.g.*, *Lewis v. LeGrow*, 670 N.W.2d 675, 689 (Mich. Ct. App. 2003) (defendant secretly videotaped his sexual encounters with the plaintiffs); *Doe v. Mills*, 536 N.W.2d 824, 834 (Mich. Ct. App. 1995) (per curiam) (defendant published outside an abortion clinic the names of individuals about to have abortions).

## IV.

For these reasons, we affirm the judgment of the district court.